## 53708. CONTINENTAL NUT COMPANY v. SAVANNAH BANK & TRUST COMPANY OF SAVANNAH et al.

MARSHALL, Judge.

The appellant, Continental Nut Company, brings this appeal from the orders of the court below, first in denying all the prayers of intervention, and then in dismissing the intervention.

This litigation has followed a long and tortuous course. As early as 1948, Consolidated Pecan Sales Company was engaged in financial dealings with the Florida National Bank of Jacksonville and the Savannah Bank & Trust Company. Over the years, Consolidated Pecan obtained cash loans from both banks as well as from other financial institutions and individuals. As far as the record shows, during the period from 1958 through 1962, Consolidated Pecan was indebted to the two banks above named in a sum in excess of $400,000. Consolidated Pecan was a family-owned business. The same brothers were the owners of a corporation named 110 West Street Building, Inc., a real estate business, they owning 520 shares of that corporation and Consolidated Pecan owning the other 500 shares. In 1958, 110 West Street Building, Inc., borrowed $3,000 for an undisclosed purpose. As security, the corporation pledged the building it owned at 110 West Street, not only for the $3,000, but also to secure any other indebtedness then or thereafter owing by 110 West Street Building, Inc., as well as any indebtedness owing by Consolidated Pecan then or in the future. The security deed was also to secure a line of credit to Consolidated Pecan. The security instrument recited that the brothers

and Consolidated Pecan were the sole stockholders of the real estate corporation. There was other evidence that Consolidated Pecan maintained its corporate offices in the building at 110 West Street. As additional security for its indebtedness, Consolidated Pecan and its officers pledged with the banks certain life insurance policies, trade acceptances, equipment and supplies owned by the Pecan Corporation in the operation of its business, certain trust receipts and warehouse receipts (most of which proved to be fictitious or non-collectible), as well as quantities of pecans possessed as stock in trade.

In September, 1963, the two banks sought the appointment of a temporary receiver to marshal and protect the assets of the debtor, Consolidated Pecan, as well as seeking to obtain a judgment against the corporation and the two brothers, who were guarantors. A temporary receiver was appointed. On December 30, 1963 (upon the payment of almost $130,000 and the transfer of other property with the knowledge and consent of all the parties then concerned), one of the brothers was given a covenant not to sue, and both brothers were voluntarily dismissed as parties defendant. Thereafter, on January 4, 1964, the intervenor, Continental Nut Co., was allowed to intervene. Continental Nut obtained a court order establishing a superior lien (based upon an earlier judgment obtained in a federal district court) over and above all other creditors of Consolidated Pecan, except those creditors who held securities. The receiver was required to hold all funds realized from the sale of all unsecured assets, funds realized from a tax refund or claim from other parties, and all funds received from other sources, and to disburse such funds as might be received, upon order of the court, to pay costs of court, to pay the receiver fee, attorney fees, and a sufficient amount to cover the fieri facias from the federal court, with the remainder to be paid to the debtor.

Over the next several years, the banks successfully pursued suits seeking to recover amounts due on the trade acceptances. None of the cash or other assets derived from the sale of the secured assets was ever paid into the hands of the receiver. Certain other items were paid into his hands, such as the income tax refund. Most of this amount

was disbursed by court order.

During the progress of these proceedings, the intervenor, Continental Nut, sought and obtained information by way of interrogatories, as to the actual assets liquidated and the amounts of money obtained by the banks from the sales of the security. This amounted to something over $300,000.

In 1966, the intervenor filed an equitable pleading seeking the trial court to direct the two banks to pay all funds collected, whether from secured assets or unsecured assets, over to the receiver, and that the receiver hold the funds pending determination of the priority of liens. Subsequently, in 1969, the intervenor again filed such a petition, seeking the payment of all monies collected into the hands of the receiver, requiring the banks to pay their pro rata shares of costs, and to establish priority of liens. Prior to 1974, no hearing was held on either of these petitions.

In 1970, the banks sought summary judgment on the indebtedness owed them by Consolidated Pecan. After considering all evidence presented until that time, the trial court entered summary judgment for both banks, ratifying all previous sales and collections of assets, and affirming a deficiency due as to each bank. Consolidated Pecan brought an appeal to the grant of summary judgment. Intervenor, Continental Nut, filed a brief as amicus curiae. This court affirmed the grant of summary judgment as to each bank in *Consolidated Pecan Sales Co. v. Savannah Bank &c. Co.*, 122 Ga. App. 536 (177 SE2d 808) (1970).

Finally, in November, 1973, the intervenor moved the trial court for a hearing on its petition of 1969. There is no indication that such a hearing resulted. Subsequently, the intervenor moved the court a second time in December, 1974, for a hearing on its petition of 1969, as amended. In December, 1976, the trial court first denied the prayers of the petition and then dismissed the petition of intervention. It is from these final rulings that the intervenor brings its appeal. *Held:*

1. The appellant, Continental Nut, contends that the banks themselves sought the appointment of the receiver, therefore the banks should not be heard to

complain of the routing of all funds received through the receiver nor the payment of their fair and pro rata shares of the costs resulting from the use of the receiver. There is evidence that the receiver obtained $10,000 as a tax refund plus some other small items of cash. Costs are said to be approximately $6,000. These costs have been paid out of the tax refund. The intervenor seeks to have the banks pay their pro rata shares and not rely on the tax refund for payment of costs.

Secondly, the intervenor contends that all monies collected by the banks should have been paid to the receiver and then paid out to the creditors upon order of court. The intervenor does not contend that the secured debts did not have a higher priority than its own judgment, provided that the security predated the appellant's own judgment.

We conclude that the intervenor cannot be successful in these contentions. The clear intent of the trial court in 1963 in appointing a receiver was to protect the creditors. However, in December, 1963, all then-known concerned parties (not including the appellant), fully represented by counsel, reached an agreement whereby the two guarantors were dismissed as defendants, and the banks proceeded to collect all secured assets in their hands. These collections proceeded with the apparent knowledge and consent of the receiver and the trial court. At the time of this apparent agreement, the intervenor was not a party. In January, 1964, Continental Nut was allowed to intervene. It obtained a court order on January 28, 1974, which established the intervenor's claim was superior to all claims, except those of creditors who held securities. That order required the receiver, previously appointed, to hold all funds from the sale of unsecured assets, and all other funds from whatever source collected by the receiver, for the purpose of satisfying costs of court, receiver costs attorney fees and unsatisfied claims. That order was expressly limited to the establishment of priorities, and was not an order for the payment of funds.

Over the next several years, the banks collected upon secured assets, and with apparent knowledge of all the parties to this proceeding, none of these assets was routed through the receiver. It is not seriously contested that the

banks derived all of the money in satisfaction of their claims from secured assets, though as to the sale of the building at 110 West Street, the intervenor contests the legality of the grant of security. In essence, therefore, the intervenor urges that all monies previously collected by the banks from secured assets be returned to the receiver, who, apparently, can then pay that same amount back to banks inasmuch as it has already been determined that the amounts collected are not sufficient to satisfy the total indebtedness due each bank. It is an old and sound rule that, assuming error, such error, to be reversible, must be harmful. *Burger Chef Systems v. Newton,* 126 Ga. App. 636, 639 (191 SE2d 479) (1972). Thus, when an appellant brings a case before an appellate court, he must show error which has hurt him. The appellate court is not an expounder of theoretical law, but it administers practical law and corrects only such errors as have practically wronged the complaining party. *Brown v. City of Atlanta,* 66 Ga. 71, 76 (1880); *Mahone v. State,* 120 Ga. App. 234, 235 (3) (170 SE2d 48) (1969). What the appellant seeks is a useless and nugatory act. Furthermore, from this record, we cannot say that the trial court did not consider all the arguments now advanced by the appellant when that court granted summary judgment, inasmuch as we do not have any transcript of the trial court's actions taken in 1970. The burden of showing harmful error is on the appellant, and this must be done by the record; it may not be done in an enumeration of error or by assertions appearing only in a brief. *Jenkins v. Bd. of Zoning Appeals of City of Columbus,* 122 Ga. 412 (2) (177 SE2d 204) (1970).

2. As indicated earlier herein, the appellant contests the propriety of the diversion of proceeds of the sale of the assets of the 110 West Street corporation. It contends that the trial court erred in concluding that the 110 West Street corporation had the power to act as "accommodation maker" for the indebtedness of Consolidated Pecan Sales Co. The appellant argues that it might have been proper to pledge the assets of 110 West Street to secure the $3,000 debt. However, it asserts that, inasmuch as the building was sold for $88,000, the remaining or surplus $85,000 was an unsecured asset and should have been

surrendered to the receiver. This asset alone would have been enough to satisfy all court costs and the judgment claim held by the appellant.

As we view the evidence contained in the record before us, this assertion by the appellant is without merit. Consolidated Pecan Sales Co. and 110 West Street, Inc., were commonly owned by the same brothers, who were stockholders of all the stock of Consolidated Pecan and approximately half of the stock of 110 West Street. The remainder of 110 West Street was owned by Consolidated Pecan. Consolidated Pecan was the tenant of 110 West Street. The avowed purpose of the security deed pledging the building owned by 110 West Street was not only to secure a $3,000 loan, but also to secure a line of credit on behalf of Consolidated Pecan. It is apparent therefrom that financial failure of either 110 West Street, Inc., or Consolidated Pecan would have an impact, one upon the other. Under such circumstances, the trial court could logically and legally conclude that the two corporations were financially involved in each other's credit and business operations. Former Code § 22-1828 (c), which was in effect when the security instrument now under consideration was executed, authorized a corporation to guarantee, become surety upon or endorse the contracts or obligations of any other corporation, firm or individual as to matters in which the corporation guaranteeing had a direct interest. There being such a direct interest in this case, the trial court did not err in concluding that the entire $88,000 realized from the sale of the building was a secured asset, which, by apparent agreement between the interested parties, was not surrendered to the receiver. See *Choctaw Lumber Co. v. Atlanta Band Mill,* 88 Ga. App. 701, 703 (77 SE2d 333) (1953). See also *Mercantile Trust Co. v. Kiser,* 91 Ga. 636 (18 SE 358) (1893); *Williams Bros. Lumber Co. v. Young Men's Syrian Assn.,* 65 Ga. App. 480 (15 SE2d 908) (1941).

3. In its remaining enumeration of error, the appellant contends that the appellees should be required to pay their pro rata portions of the costs. As indicated herein earlier, the original order of the trial court directed that all costs would be paid out of the assets coming into the hands of the receiver. That has in fact been done. The

appellant admits that approximately $6,000 of costs have been incurred to date and that all these costs have been paid out of assets in the hands of the receiver. The appellant does not contend that all costs resulting from the appeal taken from the grant of summary judgment in 1970 have not been paid. Insofar as this record is concerned, that which was ordered by the trial court has been done. The appellant has not shown how or why the appellees are required to share costs of a receiver and other related costs involving secured assets where that receiver has taken no action to account for or disburse such funds. The duty of an appellate court is to correct errors alleged to have been made in the trial court and not to manufacture them. *Hess Oil &c. Co. v. Nash*, 226 Ga. 706, 709 (177 SE2d 70) (1970). This enumeration is without merit.

*Judgment affirmed. Deen, P. J., and Banke, J., concur.*

SUBMITTED APRIL 6, 1977 — DECIDED MAY 17, 1977 — REHEARING DENIED JUNE 9, 1977 —

*Burt, Burt & Rentz, H. P. Burt,* for appellant.

*Perry, Walters, Lippitt & Custer, Jesse W. Walters, Divine, Wilkin, Deriso & Raulerson, Edgar B. Wilkin, Jr., William M. Chandler,* for appellees.